**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

YESHONDA DRIGGINS, *individually and on behalf of all others similarly situated*,

                                    Plaintiff,

            v.

PROGRESSIVE ADVANCED INSURANCE COMPANY, *an Ohio corporation*,

                                    Defendant.

Case No.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiff Yeshonda Driggins ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Progressive Advanced Insurance Company ("Progressive" or "Defendant") and alleges as follows:

**INTRODUCTION**

1.      This is a class action on behalf of Plaintiff and all other similarly situated claimants in Pennsylvania who received a payment for the loss of a totaled vehicle from Defendant, where Defendant used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to determine the actual cash value of the loss vehicles. By using these valuation reports, Defendant systemically thumbs the scale when calculating the actual cash value ("ACV") of claimants' loss vehicles by applying so-called "Projected Sold Adjustments" that are: (a) deceptive and unexplained; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by Defendant and Mitchell to insureds in other states like California.

1

2.     In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the actual cash value ("ACV") of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.     When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the actual cash value of the vehicles. Specifically, under their insurance policy terms and applicable Pennsylvania law, Defendant has a duty to pay, and represent that they will pay, the actual cash value of a loss vehicle when adjusting total loss claims. Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by using a valuation process that employs improper and unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the claim payment to the insured/claimant.

4.     Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the actual cash value of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 11.

2

5.     An integral part of Defendant's fraudulent scheme is a provision of the Policy which requires the parties to submit to an appraisal of the loss if there is a disagreement over the loss. The appraisal provision requires the insured and the insurer to each hire, at their own expense, an appraiser, and to bear equally the expenses of an umpire selected by the two appraisers, as well as any other expenses of the appraisal. Since the amount by which the insureds' total-loss claims are underpaid is likely less (or only marginally greater) than the cost of the appraisal, Defendant knows and intends that the insureds will forego the appraisal process and accept the artificially determined loss-payment for the total-loss claims. As designed by Defendant, the appraisal provision prevents plaintiff and the Class from effectively vindicating their rights under the Policy.

6.     To be clear, this case does not present a dispute about loss—which both Parties agree exceeds ACV, such that the vehicle is a total loss—or even ACV, which Defendant never determines. Rather, this case challenges Defendant's systematic and fraudulent scheme to mis-value insureds' vehicles that are declared a total loss in a manner which does not comport with representations made by Defendant or obligations undertaken by Defendant in its Policies, in order to illegally increase its own profits. This is an issue that cannot be resolved through an appraisal process.

7.     Moreover, the Policy is an unconscionable contract that was unilaterally drafted by Defendant with full knowledge of the unfair scheme it intended to employ to artificially reduce the value of its insured's vehicles, and neither Plaintiff nor the members of the Class had any roll in drafting its terms.

8.     Through Defendant's deceptive, fraudulent, and unfair scheme, Defendant violated consumer protection laws, including the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2, *et seq.*, breached its contracts and the covenant of good faith and fair dealing under the Pennsylvania Civil Actions and Proceedings Act, 42 Pa. C. S. §8371, and

was unjustly enriched.

9.      As a result of Defendant's deceptive, fraudulent, and unfair scheme, Plaintiff did not receive the benefit of her bargain, and thus sustained actual damages.

10.      By this action, Plaintiff, individually and on behalf of the Class, seek damages and injunctive and declaratory relief.

## PARTIES

11.      Plaintiff Yeshonda Driggins, at all relevant times, was a Pennsylvania citizen. At all relevant times, Plaintiff was contracted with Progressive for automobile insurance. On or about October 9, 2019, Plaintiff was in a car wreck and Defendant deemed her vehicle to be a total loss.

12.      Defendant Progressive Advanced Insurance Company is an Ohio company with its principal place of business in Ohio. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensivecoverage.

## JURISDICTION AND VENUE

13.      Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Pennsylvania. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Pennsylvania.

14.      Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

15.      Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts

business in this District.

## FACTUAL ALLEGATIONS

16.     On October 9, 2019, Plaintiff was involved in a car wreck and sustained physical damage to her vehicle.

17.     Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

18.     Pursuant to the same policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to offer her the actual cash value of her loss vehicles, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Pennsylvania law.

19.     When calculating their valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." The process has no material differences relevant to this action, regardless of whether it involves first-party or third-party claimants or which Progressive Group entities were directly involved in the issuance of the relevant policy. This process involves obtaining a "Vehicle Valuation Report" from Mitchell and then using and relying upon the valuation provided by Mitchell to determine the benefit payment under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on October 11, 2019. *See* Exhibit B.

20.     The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles recently sold or for sale in the claimant's geographic area. The reports also contain a purported valuation for the loss vehicle based upon advertisements for comparable vehicles listed in the report. The report

then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 11.

21.     In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$896.00, -$976.00, -$977.00, -$976.00, -$804.00, -$839.00 and -$805.00 respectively, were applied to each of the seven comparable vehicles. Exhibit B at pp. 6-10.

22.     Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 11.

23.     Defendant's Projected Sold Adjustments are deceptive. As part of a deceptive practice to lower the value of property claims, Defendant does not do what it says it will do – pay actual cash value. Moreover, as described above, Defendant provides no explanation or justification for the Projected Sold Adjustment, much less the specific amount applied, other than the speculation that it "reflect[s] consumer behavior." Exhibit B at p. 11.

24.     In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to reflect the intense competition in the context of internet pricing and comparison shopping. A negotiated price discount would be highly atypical and therefore is not proper to include in determining actual cash value. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing

behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement and have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

25.     Defendant's Projected Sold Adjustments are contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining actual cash value, including use of comparable vehicles. Defendant begins the process of valuing loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales in favor of Progressive. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and make dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining actual cash value. Appraisers use advertised prices and only make adjustments based on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

26.     The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

27.     On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive Group entities do not apply these adjustments when valuing total losses in California. There is no justification for applying these adjustments when valuing total losses in Pennsylvania while not subjecting

California claimants to the same negative adjustments.

28.     Plaintiff and each member of the class were damaged by Defendant's application of these Projected Sold Adjustments because they were not paid the actual cash value they would have received had Defendant applied proper methodologies and appraisal standards.

29.     Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendant for actual cash value.  Specifically, for Plaintiff, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendant would have been $896.14 higher,[1] before adding the related increase in payments for applicable sales taxes.

**Defendant's Deceptive and Unfair Appraisal Process**

30.     An integral part of Defendant's fraudulent scheme is a provision of Policy which requires the parties to submit to an appraisal if there is a disagreement over the amount of loss. The appraisal provision requires the insured and the insurer to hire, at their own expense, an appraiser and to bear equally the expenses of an umpire selected by the two appraisers, as well as any other expenses of the appraisal. Since the amount by which theinsureds' total-loss claims are underpaid is likely less than the cost of the appraisal, Defendant knows that the insureds will almost certainly forego the appraisal process and accept the artificially reduced ACVof the vehicle for their total-loss claims. As designed, the appraisal clause prevents plaintiff and the Class from effectively vindicating their statutory and common law causes of action.

31.     To be clear, this case does not present a dispute about the amount of loss. Plaintiff does not contest Defendant's determination of the amount of loss, nor that the amount of loss exceeded the vehicle's ACV, such that the vehicle was determined by Defendant to be a total loss,

---

[1] $896.14 is the average of the Projected Sold Adjustments applied to all seven comparable vehicles in Plaintiff's valuation report.

i.e., totaled (uneconomical to repair). Rather, this case challenges Defendant's fraudulent scheme to illegally undervalue insureds' vehicles that are declared a total loss, in order to increase its own profits. This is an issuethat cannot be resolved through an appraisal process that is part of that very scheme.

32. Importantly, Plaintiff does not contest the ***amount*** of the Projected Sold Adjustment. Said another way, it is not that Defendant believes the Policy and Pennsylvania law allow for a 6% Projected Sold Adjustment, while Plaintiff believes only a 3% adjustment is permitted. Rather, Plaintiff alleges that ***no Projected Sold Adjustment is permitted at all*** as a matter of law. This question cannot be determined through appraisal.

33. In sum, there is no dispute over the amount of loss. The dispute is over the vehicle's ACV.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Pennsylvania citizens insured by Defendant who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

35. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

36. Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses, or modified in any other way.

37.     **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

38.     **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.  Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine actual cash value;

    b.  Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the actual cash value of Plaintiff's and Class members' total loss vehicles;

    c.  Whether representing to claimants that the Mitchell valuation equated with the total loss vehicle's actual cash value was deceptive;

    d.  Whether Defendant's deceptive acts and improper practices injured Plaintiff and members of the Class;

    e.  Whether Defendant's acts violated their obligations under the policy of insurance;

    f.  Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

    g.  Whether Plaintiff and members of the Class are entitled to an injunction restraining Progressive's future deceptive acts and practices.

39.     **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

40.     **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

41.     **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT 1
## VIOLATIONS OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.*

42.     Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

43.     This Count is brought by Plaintiff individually and on behalf of the Class.

44.     Defendant, Plaintiff, and the Class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

45.     Plaintiff and the Class members purchased services in "trade" and "commerce," as defined by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

46.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"), 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.*, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

47.     As alleged herein, Defendant, through its agents, employees, and/or subsidiaries, violated the Pennsylvania UTPCPL by knowingly and intentionally concealing and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, the amount of Defendant's total-loss payments to insureds, as detailed above.

48.     Moreover, Defendant knowingly and intentionally represented that the specific car dealers were "likely" to sell the vehicles for significantly less than the online listed price, despite (i) never having spoken with or discussed such issue with any of the represented car dealers and (ii) knowing that it was exceedingly ***unlikely*** that the vehicles would be sold for less than the online listed price and, indeed, more likely that the vehicles would be sold for ***more*** than the online listed price.

49.     Defendant also failed to comply with Pennsylvania law, which requires replacement value to be determined by one of the following methods: "(i) Guide source method. The appraiser shall calculate the average of two figures reflecting the retail book value of a vehicle of like kind and condition, as provided by guide sources approved by the Commissioner. A listing of approved guide sources will be published once a year in the Pennsylvania Bulletin. The appraised value shall be adjusted for equipment and mileage, less the cost of repair of damage which preexisted the accident in question. No other deductions may be taken except for salvage and then only if the owner elects to retain the vehicle. (ii) Actual cost method. The appraiser shall determine the actual cost of purchase of an available motor vehicle of like kind and quality in condition similar to or better than the motor vehicle being appraised in its predamaged condition. The appraiser shall specify, in writing, the location of the vehicle of like kind and quality. (iii) Dealer quotation method. The appraiser shall consult with dealers or other persons knowledgeable in the field to secure quotations as to the value of the motor vehicle being appraised. At least two quotations shall be secured. The figures thus secured shall be averaged." Pennsylvania 31 Pa. Code §62.3(e).

50.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles and its failure to comply with Pennsylvania law, as detailed above, Defendant engaged in one or more unfair or deceptive business practices prohibited by the Pennsylvania UTPCPL, including without limitation, advertising goods or services with intent not to sell them as advertised and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

51.     Defendant's misrepresentations and omissions regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles were made to Plaintiff and the Class

members in a uniform manner.

52.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce the amount of Defendant's total-loss payments to its insureds.

53.     The facts regarding Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decisions with respect to Defendant's insurance coverage.

54.     Plaintiff and Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own.

55.     Defendant had an ongoing duty to Plaintiff and the Class members to refrain from engaging in unfair or deceptive practices under the Pennsylvania UTPCPL in the course of its business. Specifically, Defendant owed Plaintiff and Class members a duty to disclose all the material facts concerning its application of an arbitrary Projected Sold Adjustment to comparable vehicles because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiff and the Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

56.     Plaintiff and the Class members were aggrieved by Defendant's violations of the

Pennsylvania UTPCPL because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, including that the Projected Sold Adjustment is arbitrarily selected and applied, in an inconsistent manner designed to decrease Defendant's total-loss payments under the Policy.

57.     Plaintiff and the Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts regarding its purported payment of ACV in the event of a total loss and Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

58.     Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and Class members would not have purchased insurance coverage from Defendant or would not have paid as much for it and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

59.     Defendant's violations of the Pennsylvania UTPCPL present a continuing risk of future harm to Plaintiff and the Class members.

60.     Plaintiff and the Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Pennsylvania UTPCPL and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Pennsylvania UTPCPL.

## COUNT 2
## BREACH OF CONTRACT

61.     Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

62.     This Count is brought by Plaintiff individually and on behalf of the Class.

63.     Plaintiff and each of the other Class members were insured under a policy issued by Defendant, as described herein.

64.     Plaintiff and each of the other Class members made claims under their insurance contracts, which Defendant determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

65.     Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendant purported to pay Plaintiff and each of the other Class members the ACV of their totaled vehicles.

66.     Defendant, however, failed to pay the ACV of Plaintiff's and Class members' vehicles because Defendant applied an arbitrary and capricious Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendant's total-loss payments to insureds.

67.     Defendant also failed to comply with Pennsylvania law, which requires replacement value to be determined by one of the following methods: "(i) Guide source method. The appraiser shall calculate the average of two figures reflecting the retail book value of a vehicle of like kind and condition, as provided by guide sources approved by the Commissioner. A listing of approved guide sources will be published once a year in the Pennsylvania Bulletin. The appraised value shall be adjusted for equipment and mileage, less the cost of repair of damage which preexisted the accident in question. No other deductions may be taken except for salvage and then only if the owner elects to retain the vehicle. (ii) Actual cost method. The appraiser shall determine the actual cost of purchase of an available motor vehicle of like kind and quality in condition similar to or better than the motor vehicle being appraised in its predamaged condition. The appraiser shall specify, in writing, the location of the vehicle of like kind and quality. (iii)

Dealer quotation method. The appraiser shall consult with dealers or other persons knowledgeable in the field to secure quotations as to the value of the motor vehicle being appraised. At least two quotations shall be secured. The figures thus secured shall be averaged." Pennsylvania 31 Pa. Code §62.3(e).

68.     Thus, Defendant failed to pay Plaintiff and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached its contract with Plaintiff and each of the other Class members.

69.     As a result of such contractual breaches, Plaintiff and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 3
## BREACH OF COVENANT OF GOOD FAITH OR FAIR DEALING

70.     Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

71.     This Count is brought by Plaintiff individually and on behalf of the Class.

72.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

73.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

74.     Under the Policy, Defendant had discretion to perform its obligations under the

contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendant, however exercised its discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of its total-loss payments to insureds, as alleged herein.

75.     Defendant also failed to comply with Pennsylvania law, which requires replacement value to be determined by one of the following methods: "(i) Guide source method. The appraiser shall calculate the average of two figures reflecting the retail book value of a vehicle of like kind and condition, as provided by guide sources approved by the Commissioner. A listing of approved guide sources will be published once a year in the Pennsylvania Bulletin. The appraised value shall be adjusted for equipment and mileage, less the cost of repair of damage which preexisted the accident in question. No other deductions may be taken except for salvage and then only if the owner elects to retain the vehicle. (ii) Actual cost method. The appraiser shall determine the actual cost of purchase of an available motor vehicle of like kind and quality in condition similar to or better than the motor vehicle being appraised in its predamaged condition. The appraiser shall specify, in writing, the location of the vehicle of like kind and quality. (iii)Dealer quotation method. The appraiser shall consult with dealers or other persons knowledgeable in the field to secure quotations as to the value of the motor vehicle being appraised. At least two quotations shall be secured. The figures thus secured shall be averaged." Pennsylvania 31 Pa. Code §62.3(e).

76.     As such, Defendant breached the covenant of good faith and fair dealing by, *inter alia*:

> a.  Intentionally applying Projected Sold Adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

    b.   Failing to pay insureds the ACV of their total-loss vehicles;

    c.   Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total- loss vehicles and avoid paying insureds the ACV on their total-loss claims;

    d.   Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

77.    Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment.

## COUNT 4
## UNJUST ENRICHMENT

78.    Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

79.    This Count is brought by Plaintiff individually and on behalf of the Class.

80.    Plaintiff pleads this claim separately as well as in the alternative to her other claims, as without such claims she would have no adequate legal remedy.

81.    Defendant requested and received a monetary benefit at the expense of Plaintiff and Class members in the form of premium payments for automobile insurance coverage.

82.    Defendant misrepresented, omitted, concealed, and/or failed to disclose material facts regarding its purported payment of ACV in the event of a total loss, specifically Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

83.    Defendant also failed to comply with Pennsylvania law, which requires replacement value to be determined by one of the following methods: "(i) Guide source method.

The appraiser shall calculate the average of two figures reflecting the retail book value of a vehicle of like kind and condition, as provided by guide sources approved by the Commissioner. A listing of approved guide sources will be published once a year in the Pennsylvania Bulletin. The appraised value shall be adjusted for equipment and mileage, less the cost of repair of damage which preexisted the accident in question. No other deductions may be taken except for salvage and then only if the owner elects to retain the vehicle. (ii) Actual cost method. The appraiser shall determine the actual cost of purchase of an available motor vehicle of like kind and quality in condition similar to or better than the motor vehicle being appraised in its predamaged condition. The appraiser shall specify, in writing, the location of the vehicle of like kind and quality. (iii) Dealer quotation method. The appraiser shall consult with dealers or other persons knowledgeable in the field to secure quotations as to the value of the motor vehicle being appraised. At least two quotations shall be secured. The figures thus secured shall be averaged." Pennsylvania 31 Pa. Code §62.3(e).

84.    If Defendant had not misrepresented, omitted, concealed, and/or failed to disclose material facts regarding its purported payment of ACV in the event of a total loss, specifically Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds and its failure to comply with Pennsylvania law, Plaintiff and the Class members either would not have purchased insurance through Defendant, or they would have paid less for such insurance coverage.

85.    Accordingly, Defendant was unjustly enriched by the premiums paid by Plaintiff and the Class members to the detriment of Plaintiff and the Class members.

86.    Plaintiff and the Class members are, thus, entitled to restitution and disgorgement in the amount Defendant was unjustly enriched, in an amount to be determined at trial.

## COUNT 5
## DECLARATORY JUDGMENT

87.     Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

88.     This Count is brought by Plaintiff individually and on behalf of the Class.

89.     A dispute between Plaintiff and the Class and Defendant is before this Court concerning the construction of the auto insurance policies issued by Defendant, and the rights of Plaintiff and the Class arising under that policy.

90.     Plaintiff, individually and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiff seeks a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendant's insurance contract, as well as a violation of law, for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary Projected Sold Adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not as reasonably specific or appropriate as to dollar amount.

91.     Defendant's unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendant has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class.

92.     As a result of these breaches of contract, Plaintiff and the Class members have been injured.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully seeks judgement in Plaintiff's favor and in favor of the Class as follows:

A. An Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. An award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiff and the Class in an amount to be determined at trial, plus interest, in accordance with law;

C. Disgorgement of Defendant's profits;

D. Appropriate preliminary and/or final injunctive or equitable relief against the conduct of Defendant's described herein;

E. An award Plaintiff's and the Class' costs of suit, including reasonable attorneys' fees as provided by law; and

F. An award such further and additional relief as is necessary to redress the harm caused by Defendant's unlawful conduct and as the Court may deem just and proper under the circumstances.

Dated: March 21, 2022                                Respectfully submitted,

/s/ Jonathan M. Jagher
Jonathan M. Jagher
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Tel.: (610) 234-6487
Fax: (224) 632-4521
jjagher@fklmlaw.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.*
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

Scott Edelsberg, Esq.*
Christopher Gold, Esq.*
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone:  305-975-3320
scott@edelsberglaw.com
chris@edelsberglaw.com

*Pro Hac Vice to be filed*

***Counsel for Plaintiff and the Proposed Class***

# EXHIBIT A

**9611D PA 0216**

# PENNSYLVANIA
## AUTO POLICY

THIS POLICY, THE **DECLARATIONS PAGE**, **YOUR** INSURANCE APPLICATION, AND ANY APPLICABLE ENDORSEMENTS CONTAIN THE TERMS OF THE CONTRACT OF INSURANCE BETWEEN **US** AND THE POLICYHOLDER.

**NOTICE: IF YOU BUY COLLISION COVERAGE, IT DOES NOT APPLY TO AUTOS RENTED FOR SIX MONTHS OR MORE.**

Form 9611D PA (02/16)
version 2.0



**INSURING AGREEMENT** ............................................................................. 1

**GENERAL DEFINITIONS** ........................................................................... 1

**PART I—LIABILITY TO OTHERS**

Insuring Agreement ...................................................................................3
Additional Definition .................................................................................3
Additional Payments .................................................................................3
Exclusions ...............................................................................................4
Limits of Liability .....................................................................................5
Financial Responsibility Laws ....................................................................6
Other Insurance .......................................................................................6
Out-of-State Coverage .............................................................................6

**PART II—FIRST PARTY BENEFITS COVERAGE**

Insuring Agreement—First Party Benefits Coverage.....................................7
Insuring Agreement—Combination First Party Benefits Coverage..............7
Insuring Agreement—Extraordinary Medical Benefits Coverage .................7
Additional Definitions.................................................................................8
Exclusions ...............................................................................................9
Limits of Liability.......................................................................................10
Other Insurance .......................................................................................10
Priority of Policies.....................................................................................11

**PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE**

Insuring Agreement—Uninsured Motorist Coverage ...................................11
Insuring Agreement—Underinsured Motorist Coverage...............................12
Additional Definitions.................................................................................12
Exclusions ...............................................................................................14
Limits of Liability.......................................................................................14
Other Insurance .......................................................................................16

**PART IV—DAMAGE TO A VEHICLE**

Insuring Agreement—Collision Coverage ..................................................16
Insuring Agreement—Comprehensive Coverage ........................................17
Insuring Agreement—Additional Custom Parts or
   Equipment Coverage ............................................................................17
Insuring Agreement—Rental Reimbursement Coverage..............................18
Insuring Agreement—Loan/Lease Payoff Coverage ...................................18
Insuring Agreement—Pet Injury Coverage ................................................19
Additional Definitions.................................................................................19
Exclusions ...............................................................................................20
Limits of Liability.......................................................................................21
Payment of Loss.......................................................................................22
No Benefit to Bailee .................................................................................23
Loss Payable Clause.................................................................................23

Other Sources of Recovery .................................................................................23
Appraisal ...........................................................................................................23


**PART V—ROADSIDE ASSISTANCE COVERAGE**

Insuring Agreement ...........................................................................................24
Additional Definitions.........................................................................................24
Exclusions .........................................................................................................24
Unauthorized Service Provider...........................................................................25
Other Insurance .................................................................................................25


**PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS**...........................25


**PART VII—GENERAL PROVISIONS**

Policy Period and Territory...................................................................................26
Changes.............................................................................................................26
Duty to Report Changes ....................................................................................27
Settlement of Claims ..........................................................................................27
Terms of Policy Conformed to Statutes ..............................................................27
Transfer of Interest .............................................................................................27
Fraud or Misrepresentation ................................................................................28
Payment of Premium and Fees ..........................................................................28
Cancellation .......................................................................................................29
Cancellation Refund............................................................................................29
Nonrenewal ........................................................................................................30
Automatic Termination ........................................................................................30
Legal Action Against Us......................................................................................30
Our Rights to Recover Payment..........................................................................30
Joint and Individual Interests...............................................................................31
Bankruptcy .........................................................................................................31

## INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

## GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in boldface type and have the same meaning whether in the singular, plural, or any other form.

1. "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page** if:
   a. **we** insure all other **autos you** own;
   b. the **additional auto** is not covered by any other insurance policy;
   c. **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
   d. **you** pay any additional premium due.

   An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.

2. "**Auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

3. "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.

4. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

5. "**Covered auto**" means:
   a. any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
   b. any **additional auto**;
   c. any **replacement auto**; or
   d. a **trailer** owned by **you**.

6. "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

1

7. "**Occupying**" means in, on, entering or exiting.

8. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of private passenger motor vehicles for use by individuals, businesses, or other entities.

9. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

10. "**Rated resident**" means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:
    a. listed in the "Drivers and household residents" section on the **declarations page**; and
    b. not designated as either an "Excluded" or a "List Only" driver.

11. "**Relative**" means:
    a. a person residing in the same household as **you**, and related to **you** by blood, marriage or adoption, and includes a ward, stepchild, or foster child;
    b. a minor child in the custody of:
       (i) **you**; or
       (ii) a person residing in **your** household who is related to **you**; or
    c. **your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

12. "**Replacement auto**" means an **auto** that permanently replaces an **auto** shown on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV—Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.

13. "**Ride-sharing activity**" means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a user logs on to, or signs in to, any online-enabled application, software, website or system until the time the user logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the user has accepted any passenger(s) or delivery assignment, including the time the user is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

14. "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:
    a. for commercial purposes;
    b. as an office, store, or for display purposes; or
    c. as a passenger conveyance.

15. "**Transportation network company**" means a corporation, partnership, sole proprietorship, or other entity that uses any online-enabled application, software,

2

website or system to connect drivers with clients or passengers to facilitate and/or provide transportation or delivery services for compensation or a fee.

16. "**We**," "**us**" and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.

17. "**You**" and "**your**" mean:
    a. a person shown as a named insured on the **declarations page**; and
    b. the spouse of a named insured if residing in the same household at the time of the loss.

## **PART I—LIABILITY TO OTHERS**

### **INSURING AGREEMENT**

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.

### **ADDITIONAL DEFINITION**

When used in this Part I:

"**Insured person**" means:
a. **you**, a **relative**, or a **rated resident** with respect to an accident arising out of the ownership, maintenance or use of an **auto** or a **trailer**;
b. any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
c. any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a. or b. above; and
d. any "Additional Interest" shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a. or b. above.

### **ADDITIONAL PAYMENTS**

In addition to **our** limit of liability, **we** will pay for an **insured person**:

1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
3. up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and
4. reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

3

**EXCLUSIONS** — **READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.**

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:

1. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle or trailer while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;

2. any liability assumed under any contract or agreement by **you**, a **relative**, or a **rated resident**;

3. **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;

4. **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;

5. **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or racecourse;

6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;

7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

8. any obligation for which the United States Government is liable under the Federal Tort Claims Act;

9. **bodily injury** or **property damage** caused by an intentional act of that **insured person**, or at the direction of that **insured person**, even if the actual injury or damage is different than that which was intended or expected;

10. **property damage** to any property owned by, rented to, being transported by, used by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or a rented garage;

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or a **rated resident** or furnished or available

4

for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your**, a **relative's**, or a **rated resident's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

15. punitive or exemplary damages; or

16 **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether that **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

The "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any

one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment to a person under this Part I will be reduced by any payment to that person under Part III—Uninsured/Underinsured Motorist Coverage.

**We** will not pay under this Part I any expenses paid or payable under Part II—Medical Payments Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

### FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

### OTHER INSURANCE

If there is any other applicable liability insurance or bond, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a vehicle or trailer, other than a **covered auto**, will be excess over any other collectible insurance, self-insurance, or bond.

### OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
    a. the required minimum amounts and types of coverage; or
    b. the limits of liability under this policy.

6

**INSURING AGREEMENT—FIRST PARTY BENEFITS COVERAGE**

If **you** pay the premium for this coverage, **we** will pay the following First Party Benefits, subject to the limit of liability shown on **your declarations page**, for loss or expense sustained by an **insured person** because of **bodily injury** caused by an accident and arising out of the maintenance or use of a **motor vehicle**:

1. **medical expenses**;
2. **income loss**;
3. **funeral benefit**; and
4. **accidental death benefit**.

**INSURING AGREEMENT—COMBINATION FIRST PARTY BENEFITS COVERAGE**

If **you** pay the premium for this coverage, **we** will pay **medical expenses**, **income loss**, **funeral benefit**, and **accidental death benefit**, subject to the combined single limit of liability shown on **your declarations page**, for each **insured person** who sustains **bodily injury** caused by an accident and arising out of the maintenance or use of a **motor vehicle**. Subject to the combined single limit of liability, the most **we** will pay as the **funeral benefit** for an **insured person** is $2,500, and the most **we** will pay as the **accidental death benefit** for an **insured person** is $25,000. **We** will only pay for expenses or loss incurred within three years from the date of the accident.

**INSURING AGREEMENT—EXTRAORDINARY MEDICAL BENEFITS COVERAGE**

If **you** pay the premium for this coverage, subject to the limit of liability shown on **your declarations page**, **we** will pay **medical expenses** incurred by an **insured person** in excess of the aggregate of $100,000 that result from **bodily injury** caused by an accident and arising out of the maintenance or use of a **motor vehicle**, subject to the following:

1. The limit of liability shown on the **declarations page** for Extraordinary Medical Benefits Coverage is the most **we** will pay for **medical expenses** incurred by an **insured person** as the result of an accident to which this Extraordinary Medical Benefits Coverage applies, and is subject to the following additional limits:
   a. an annual limit of $50,000 for **medical expenses** incurred by an **insured person**; and
   b. a lifetime aggregate limit of $1,000,000 for **medical expenses** incurred by an **insured person**.

   However, the $50,000 annual limit shall not apply to **medical expenses** covered by Extraordinary Medical Benefits Coverage that are incurred during the first 18 months of eligibility.

2. Any amounts payable by **us** as Extraordinary Medical Benefits will be excess to any amounts available to an **insured person** for **medical expense** under any First Party Benefits Coverage provided in accordance with the Pennsylvania Motor Vehicle Financial Responsibility Law.

7

3. If an **insured person** is eligible for Extraordinary Medical Benefits Coverage and is also eligible for benefits under the Pennsylvania Catastrophic Loss Trust Fund, the combined total recovery under Extraordinary Medical Benefits Coverage and the Pennsylvania Catastrophic Loss Trust Fund for **medical expenses** incurred by an **insured person** as the result of an accident shall not exceed $1,000,000.

## ADDITIONAL DEFINITIONS

When used in this Part II:
1. "**Accidental death benefit**" means a death benefit paid to the personal representative of the **insured person**, should injury caused by a **motor vehicle** accident result in death within 24 months from the date of the accident.
2. "**Funeral benefit**" means the reasonable and necessary expenses directly related to the funeral, burial, cremation, or other form of disposition of the remains of a deceased **insured person**, incurred due to the death of the **insured person** if death:
   a. results from a **motor vehicle** accident; and
   b. occurs within 24 months from the date of the accident.
3. "**Income loss**" means 80% of actual loss of gross income of an **insured person**. It also includes reasonable expenses actually incurred for:
   a. hiring a substitute to perform services the **insured person** would have performed in connection with self-employment, in order to mitigate or reduce loss of gross income; or
   b. hiring special help to enable the **insured person** to work and mitigate loss of gross income.

   **We** will not pay for "**income loss**" for:
   a. loss of income during any period following the death of an **insured person**;
   b. expenses incurred for services performed following the death of an **insured person**; or
   c. any loss of income during the first five days the **insured person** did not work after the accident due to the **bodily injury** caused by the accident.
4. "**Insured person**" means:
   a. with respect to **medical expenses**, **income loss**, and **funeral benefit**:
      (i) **you**, a **relative**, or a **rated resident**; and
      (ii) any other person:
         (a) while **occupying your covered auto** with the express or implied permission of **you**, a **relative** or a **rated resident**; or
         (b) while not **occupying** a **motor vehicle** if injured as a result of an accident which occurs in Pennsylvania involving **your covered auto**. This does not apply if **your covered auto** is parked and unoccupied at the time of the accident unless it was parked in a manner as to create an unreasonable risk of injury; and
   b. with respect to an **accidental death benefit**, **you**, a **relative**, or any **rated resident**.
5. "**Medical expense**" means the reasonable charge for necessary medical treatment and rehabilitative services, including, but not limited to:
   a. hospital, dental, surgical, psychiatric, psychological, osteopathic, ambulance, chiropractic, and nursing services;

8

b. licensed physical therapy, vocational rehabilitation, occupational therapy, speech pathology and audiology therapy, and optometric services; and

c. medications, medical supplies, and prosthetic devices;

all without limitation as to time, provided that, within 18 months from the date of the accident causing **bodily injury**, it is ascertainable, with reasonable medical probability, that further **medical expense** may be incurred as a result of the **bodily injury**. "**Medical expense**" may include any non-medical remedial care and treatment rendered in accordance with a recognized religious method of healing.

6. "**Motor vehicle**" means a self-propelled vehicle, operated or designed for use upon public roads. However, **motor vehicle** does not include a vehicle operated:
   a. by muscular power; or
   b. on rails or tracks.

7. "**Your covered auto**" means a **motor vehicle** for which **you** have purchased:
   a. Part I—Liability To Others Coverage if the **motor vehicle** is:
      (i) owned by **you**; or
      (ii) shown on the **declarations page**; and
   b. First Party Benefits Coverage as required under the Pennsylvania Motor Vehicle Financial Responsibility Law.

8. "**Bodily injury**" in Part II means accidental bodily harm to a person and that person's resulting illness, disease or death.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.**

**We** do not provide any First Party Benefits under this Part II for **bodily injury**:

1. sustained by any person while intentionally causing or attempting to cause **bodily injury** to:
   a. himself or herself; or
   b. any other person;

2. sustained by any person while committing a felony;

3. sustained by any person while seeking to elude lawful apprehension or arrest by a law enforcement official;

4. sustained by any person while maintaining or using a **motor vehicle** knowingly converted by that person. However, this exclusion does not apply to **you**;

5. sustained by any person who, at the time of the accident:
   a. is the owner of one or more registered **motor vehicles** that do not have in effect the security required by the Pennsylvania Motor Vehicle Financial Responsibility Law; or
   b. is **occupying** a **motor vehicle** owned by that person for which the financial responsibility required by the Pennsylvania Motor Vehicle Financial Responsibility Law is not in effect;

   This exclusion does not apply to **you**, a **relative**, or a **rated resident**:
   a. while **occupying** a covered auto;
   b. while **occupying** a **motor vehicle** that is not owned by **you**, a **relative**, or a **rated resident**; or
   c. when struck by a motor vehicle as a pedestrian.

9

6. sustained by any person maintaining or using a **motor vehicle** while located for use as a residence or premises;
7. sustained by any person while **occupying**:
    a. a recreational vehicle designed for use off public roads; or
    b. a motorcycle, moped, or similar type vehicle;
8. caused by or as a consequence of:
    a. any discharge of a nuclear weapon;
    b. war (whether declared or undeclared);
    c. civil war;
    d. insurrection; or
    e. rebellion or revolution;
9. from or as a consequence of the following whether controlled or uncontrolled or however caused:
    a. nuclear reaction;
    b. radiation; or
    c. radioactive contamination;
10. arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**; or
11. sustained by any person while using or **occupying** a **covered auto** while being used for **ride-sharing activity**. This exclusion does not apply to shared-expense car pools.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for each First Party Benefit under this Part II is the most **we** shall pay for that benefit to or for each **insured person** as the result of any one accident, regardless of the number of:

1. claims made;
2. **covered autos**;
3. lawsuits brought;
4. vehicles involved in the accident;
5. premiums paid; or
6. insurers providing first party benefits.

## OTHER INSURANCE

No one will be entitled to recover duplicate payments for the same elements of loss under this or any other similar automobile insurance, including self-insurance.

Any amount payable under this Part II shall be excess over any amounts paid, payable or required to be provided to an **insured person** under any workers' compensation law or similar law. Consistent with the duty of an **insured person** to cooperate with **us** in any matter concerning a claim, an **insured person** presenting a claim under this Part II shall, when eligible for workers' compensation benefits, make application for same with both the **insured person's** employer and workers' compensation insurer.

10

If there is other First Party Benefits Coverage, **we** will pay benefits under this Part II in accordance with the order of priorities set forth by the Pennsylvania Motor Vehicle Financial Responsibility Law, as amended. **We** will not pay benefits if there is another insurer at a higher level of priority. The order of priority is:

First      The insurer providing benefits to the **insured person** as a named insured.

Second  The insurer providing benefits to the **insured person** as a **relative** or as a **rated resident** who is not a named insured under another policy providing coverage under the Pennsylvania Motor Vehicle Financial Responsibility Law.

Third     The insurer of the **motor vehicle** which the **insured person** is **occupying** at the time of the accident.

Fourth   The insurer providing benefits on any **motor vehicle** involved in the accident if the **insured person** is:

a. not **occupying** a **motor vehicle**; and

b. not entitled to payment of first party benefits under any other **motor vehicle** policy.

An unoccupied parked **motor vehicle** is not a **motor vehicle** involved in an accident within this Fourth priority unless it was parked in a manner as to create an unreasonable risk of injury.

If two or more policies have equal priority within the highest applicable priority level:

1. The insurer against whom the claim is first made shall process and pay the claim as if wholly responsible. The insurer is thereafter entitled to recover contribution on a pro rata basis from any other insurer for the benefits paid and the costs of processing the claim. If contribution is sought among insurers responsible under the Fourth priority, proration shall be based on the number of involved **motor vehicles**.

2. If **we** are the insurer against whom the claim is first made, **our** payment to or for an **insured person** will not exceed the applicable limit of liability for coverage under this Part II shown on the **declarations page**, or if **you** have purchased Extraordinary Medical Benefits Coverage, the applicable limit of liability.

3. The maximum recovery under all policies may not exceed the amount payable under the policy with the highest dollar limits of benefits.

## PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE

### INSURING AGREEMENT—UNINSURED MOTORIST COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **bodily injury**:

1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance or use of an **uninsured motor vehicle**.

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance, or use of an **underinsured motor vehicle**.

An **insured person** must notify **us** in writing at least 30 days before entering into any settlement with the **owner** or operator of an **uninsured motor vehicle** or **underinsured motor vehicle**, or any liability insurer. In order to preserve **our** right of subrogation, **we** may elect to pay any sum offered in settlement by, or on behalf of, the owner or operator of an **uninsured motor vehicle** or **underinsured motor vehicle**. If **we** do this, the **insured person** shall assign to **us** all rights that **insured person** has against the owner or operator of the **uninsured motor vehicle** or **underinsured motor vehicle**, to the extent of **our** payment.

No judgment or settlement for damages arising out of a lawsuit brought against an owner or operator of an **uninsured motor vehicle** or **underinsured motor vehicle** shall be binding on **us** unless **we** have:
1. received reasonable notice of the filing of the lawsuit resulting in the judgment; and
2. had a reasonable opportunity to protect **our** interests in the lawsuit.

**ADDITIONAL DEFINITIONS**

When used in this Part III:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**;
   b. any person while operating a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
   c. any person **occupying**, but not operating, a **covered auto**; and
   d. any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a., b. or c. above.
2. "**Noneconomic loss**" means pain and suffering and other non-monetary detriment.
3. "**Rated resident**" means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:
   a. listed in the "Drivers and household residents" section on the **declarations page**; and
   b. not designated as either an "Excluded" or a "List Only" driver.
   For a coverage under this Part III that has been rejected by the named insured by signing a waiver, a **rated resident** will be considered a **relative** for purposes of the rejected coverage under this Part III.
4. "**Serious injury**" means **bodily injury** resulting in death, serious impairment of a bodily function, or permanent serious disfigurement.

12

5. "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident, but the sum of all applicable limits of liability for **bodily injury** is less than the damages that an **insured person** is entitled to recover from the owner or operator of the motor vehicle because of **bodily injury**.

An "**underinsured motor vehicle**" does not include any vehicle or equipment:

a. owned by **you**, a **relative**, or a **rated resident** or furnished or available for the regular use of **you**, a **relative**, or a **rated resident**;
b. operated on rails or crawler treads;
c. designed mainly for use off public roads, while not on public roads;
d. while used as a residence or premises and not as a vehicle;
e. that is a **covered auto**; or
f. that is an uninsured motor vehicle.

6. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:

a. to which no bodily injury liability bond or policy applies at the time of the accident;
b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:
   (i) denies coverage; or
   (ii) is insolvent, or becomes insolvent within six years after the accident occurs;
c. to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury is less than the minimum limit of liability for bodily injury specified by the financial responsibility law of the state in which the **covered auto** is principally garaged;
d. whose owner or operator cannot be identified and that causes an accident resulting in bodily injury to an insured person, provided that the **insured person**, or someone on his or her behalf:
   (i) reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident; and
   (ii) notifies **us** within 30 days, or as soon as practicable thereafter, that the **insured person** has a cause of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and sets forth the facts in support thereof.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a. owned by **you**, a **relative**, or a **rated resident** or furnished or available for the regular use of **you**, a **relative**, or a **rated resident**;
b. owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;
c. operated on rails or crawler treads;
d. designed mainly for use off public roads, while not on public roads;
e. while located for use as a residence or premises and not as a vehicle;
f. that is a **covered auto**; or
g. that is an **underinsured motor vehicle**.

**EXCLUSIONS — READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.**

Coverage under this Part III will not apply:

1. to **bodily injury** sustained by any person while using or **occupying**:
    a. a **covered auto** while being used:
        (i) to carry persons or property for compensation or a fee;
        (ii) for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
        (iii) for **ride-sharing activity**.
        This exclusion does not apply to shared-expense car pools; or
    b. a motor vehicle that is owned by or available for the regular use of **you**, a **relative**, or a **rated resident**. This exclusion does not apply to a **covered auto** that is insured under this Part III;
2. to **noneconomic loss** sustained by any person to whom a limited tort option applies unless the **bodily injury** sustained by the **insured person** is a **serious injury**;
3. to **bodily injury** sustained by **you**, a **relative**, or a **rated resident** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;
4. to any punitive or exemplary damages;
5. to **bodily injury** sustained by any person if that person or the legal representative of that person settles without **our** written consent; or
6. to **bodily injury** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage is the most **we** will pay regardless of the number of:

1. claims made;
2. **covered autos**, unless **you** have selected stacked coverage;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

### Nonstacked Limits of Liability

If you have selected nonstacked coverage under this Part III, the following shall also apply:

If the **declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person; and

14

2. subject to the "each person" limit, the amount shown for each accident is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

**Stacked Limits of Liability**

If **you** have selected stacked coverage under this Part III, the following shall also apply to **bodily injury** sustained by **you**, a **relative**, or a **rated resident**:
1. If **you**, a **relative**, or a **rated resident** sustain **bodily injury** while **occupying** a **covered auto**, the limit of liability shall be the limit available under Nonstacked Limits of Liability described above and the limit shown on the **declarations page** multiplied by the number of **covered autos** that are not involved in the **accident**.
2. If **you**, a **relative**, or a **rated resident** sustain **bodily injury** while not **occupying** a **covered auto**, the limit of liability shall be the limit shown on the **declarations page** multiplied by the number of **covered autos**.

Stacked Limits of Liability shall not increase the limit of liability applicable to any **insured person** other than **you**, a **relative**, or a **rated resident**. The nonstacked limits of liability will apply to any **insured person** other than **you**, a **relative**, or a **rated resident**.

As with nonstacked limits, the "each person" stacked limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

**Limits of Liability Applicable to Stacked and Nonstacked Coverage**

In determining the amount payable under this Part III, the amount of damages that an **insured person** is entitled to recover for **bodily injury** will be reduced by all sums paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible.

However, if an **insured person** enters into a settlement agreement for an amount less than the sum of the limits of liability under all applicable bodily injury liability bonds and

15

policies, **our** limit of liability for Underinsured Motorist Coverage shall not exceed the difference between the damages sustained by the **insured person** and the sum of the applicable bodily injury liability limits.

The Limits of Liability under this Part III shall be reduced by all sums paid under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable similar insurance available, the following priorities of recovery apply:

First    The uninsured or underinsured motorist coverage applicable to the motor vehicle the **insured person** was **occupying** at the time of the accident.

Second  Any other policy affording uninsured or underinsured motorist coverage to the **insured person**.

If two or more policies have equal priority, the insurer against whom the claim is first made shall process and pay the claim as if wholly responsible. The insurer is thereafter entitled to recover contribution on a pro rata basis from any other insurer for the benefits paid and the costs of processing the claim.

If nonstacked coverage is shown on the **declarations page** and this policy is in the First priority, the maximum recovery under all policies in the First priority shall not exceed the highest applicable limit for any one motor vehicle under any one policy in the First priority.

If nonstacked coverage is shown on the **declarations page** and this policy is in the Second priority, the maximum recovery under all policies in the Second priority shall not exceed the highest applicable limit for any one motor vehicle under any one policy in the Second priority.

## PART IV—DAMAGE TO A VEHICLE

## INSURING AGREEMENT—COLLISION COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;

and its **custom parts or equipment**, resulting from **collision**.

16

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

## INSURING AGREEMENT—COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;

and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:
1. contact with an animal (including a bird);
2. explosion or earthquake;
3. fire;
4. malicious mischief or vandalism;
5. missiles or falling objects;
6. riot or civil commotion;
7. theft or larceny;
8. windstorm, hail, water or flood; or
9. breakage of glass not caused by **collision**.

In addition, **we** will pay for:
1. reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2. loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.

A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:
1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;
3. when the **auto** has been replaced; or
4. 72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

## INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS
## OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage

17

applies in addition to any coverage automatically provided for **custom parts or equip-
ment** under Comprehensive Coverage or Collision Coverage.

### INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency
or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement
Coverage has been purchased. This coverage applies only if **you** have purchased both
Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss
is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or
accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a
maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for
rental expenses will apply.

Rental charges will be reimbursed beginning:
1. when the **covered auto** cannot be driven due to a loss; or
2. if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto
   repair shop or one of **our** Service Centers for repairs due to the loss;
and ending the earliest of:
1. when the **covered auto** has been returned to **you**;
2. when the **covered auto** has been repaired;
3. when the **covered auto** has been replaced;
4. 72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by
   **us** to be a total loss; or
5. when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

### INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this cover-
age was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any
amounts otherwise payable under this Part IV, the difference between:
1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under
   a written loan or lease agreement to which the **covered auto** is subject at the time
   of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended war-
      ranties;

18

d. charges for credit insurance or refunds due to the owner for credit insurance;
e. past due payments and charges for past due payments; and
f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

### INSURING AGREEMENT—PET INJURY COVERAGE

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or **non-owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:
1. up to $1,000 for reasonable and customary veterinary fees incurred by **you**, a **relative**, or a **rated resident** if **your pet** is injured in, or as a direct result of, the covered loss; or
2. a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**, **we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

### ADDITIONAL DEFINITIONS

When used in this Part IV:
1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.
2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:
   a. are permanently installed or attached; and
   b. alter the appearance or performance of the **auto**.
3. "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.
4. "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you**, a **relative**, or a **rated resident** while in the custody of or being operated by **you**, a **relative**, or a **rated resident** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.
5. "**Your pet**" means any dog or cat owned by **you**, a **relative**, or a **rated resident**.

19

**EXCLUSIONS — READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.**

Coverage under this Part IV will not apply for loss:

1. to any vehicle while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;
3. to any vehicle resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or racecourse;
4. to any vehicle for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
5. to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**, even if the actual damage is different than that which was intended or expected. This exclusion does not apply if the insured claimant was the victim of abuse and that abuse occurred during the claimed property damage loss.
6. to a **covered auto** while it is leased or rented to others or given in exchange for compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;
7. due to destruction or confiscation by governmental or civil authorities of any vehicle because **you**, any **relative**, or any **rated resident** engaged in illegal activities;
8. to any vehicle that is due and confined to:
   a. wear and tear;
   b. freezing;
   c. mechanical, electrical or electronic breakdown or failure; or
   d. road damage to tires.
   This exclusion does not apply if the damage results from the theft of a vehicle;
9. to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:
   a. tapes, compact discs, cassettes, DVDs, and other recording or recorded media;
   b. any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;
   c. any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and
   d. CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;

20

10. to any vehicle for diminution of value;

11. to any vehicle caused directly or indirectly by:
    a. war (declared or undeclared) or civil war;
    b. warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
    c. insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

12. to any vehicle caused directly or indirectly by:
    a. any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or
    b. any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

13. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, the **rated resident**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

**LIMITS OF LIABILITY**

1. The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
   a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
   b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
   c. the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
   d. the Stated Amount shown on the **declarations page** for that **covered auto**.
   However, the most **we** will pay for loss to:
   a. **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased.
   b. a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.

2. Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:
   a. If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.
   b. If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.
   c. Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.

21

d. In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:

    (i)   will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and

    (ii)   will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:

        (a)   original manufacturer parts or equipment; and

        (b)   nonoriginal manufacturer parts or equipment.

e. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

f. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., an adjustment may be made for betterment or depreciation and physical condition on:

    (i)   batteries;

    (ii)   tires;

    (iii)   engines and transmissions, if the engine has greater than 80,000 miles; and

    (iv)   any other **mechanical parts** that are nonfunctioning or inoperative.

    **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

g. The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

3. No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

4. Duplicate recovery for the same elements of damages is not permitted.

5. The following additional limits of liability apply to Pet Injury coverage:

    a.   The most **we** will pay for all damages in any one loss is a total of $1,000 regardless of the number of dogs or cats involved.

    b.   If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for **your pet**.

    c.   No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:

1. pay for the loss in money; or
2. repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

### NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

### LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to **your** interest and the interest of any lienholder shown on the **declarations page** or designated by **you**. At **our** option, payment may be made to both jointly, or to either separately. However, if the **covered auto** is not a total loss, **we** may make payment to **you** and the repairer of the **auto**.

The lienholder's interest will not be protected:
1.  where fraud, misrepresentation, material omission, or intentional damage resulting in a denial of coverage by **us** has been committed by or at the direction of **you** or any person seeking coverage; or
2.  where the loss is otherwise not covered under the terms of this policy.
If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this agreement will also terminate.

### OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:
1.  any coverage provided by the owner of the **non-owned auto** or **trailer**;
2.  any other applicable physical damage insurance; and
3.  any other source of recovery applicable to the loss.

### APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** or **you** may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request

23

that a judge of a court on record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:
1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;
   e. lock-out; or
   f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.

Coverage under this Part V will not apply to:
1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;
5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6. towing or storage related to impound, abandonment, illegal parking, or other violations of law;

24

   7.  assistance with jacks, levelers, airbags or awnings;
   8.  labor or repair work performed at a service station, garage, or repair shop;
   9.  auto storage charges;
10.  disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11.  mounting or removing of snow tires or chains;
12.  tire repair;
13.  disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;
14.  any **covered auto** while being used in connection with **ride-sharing activity**;
15.  any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16.  a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:
1.  towing of a **covered disabled auto** to the nearest qualified repair facility; and
2.  labor on a **covered disabled auto** at the place of disablement;
which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1.  cooperate with **us** in any matter concerning a claim or lawsuit;
2.  provide any written proof of loss **we** may reasonably require;

25

3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;

4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;

5. attend hearings and trials as **we** require;

6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;

7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;

8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require;

9. submit to vocational rehabilitation examinations at **our** expense by rehabilitation specialist **we** select as often as **we** may reasonably require; and

10. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital status;

26

**your** mailing address and **your** residence address;

7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:
1. **your** mailing address or **your** residence address;
2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital status; or
7. the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident.**

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page**

27

dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time during the first 59 days, including after the occurrence of an accident or loss, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. conceal or misrepresent any material fact or circumstance; or
3. engage in fraudulent conduct;

in connection with a requested change **we** may void the policy if within the first 59 days, or reform the policy as it existed immediately prior to the requested change during any time period. **We** may do this before or after the occurrence of an accident or loss.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

## PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

28

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

## CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 15 days notice of cancellation if:
1. **we** cancel during the first 59 days of the initial policy period; or
2. the policy is cancelled for nonpayment of premium.

**We** will give at least 60 days notice of cancellation in all other cases.

**We** may cancel this policy for any reason if the notice is mailed within the first 59 days of the initial policy period.

After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1. nonpayment of premium;
2. material misrepresentation, material concealment, or fraud by **you** with respect to any material fact in the procurement, continuation, change or renewal of this policy;
3. loss of driving privileges through suspension or revocation of an operator's license or motor vehicle registration issued to the named insured;
4. **your** place of residence or the state of registration or license of a **covered auto** is changed to a state or country in which **we** do not accept applications for the insurance provided by this policy; or
5. any other reason permitted by law.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis. However, **we** will retain a cancellation fee if this policy is cancelled at **your** request or if

29

cancellation is for nonpayment of premium. A cancellation fee will be charged only during the initial policy period.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. If nonrenewal is due to nonpayment of premium or loss of driving privileges through suspension or revocation of the named insured's operator's license or motor vehicle registration, notice will be mailed at least 15 days before the end of the policy period. If nonrenewal is due to any other reason, notice will be mailed at least 60 days before the end of the policy period.

## AUTOMATIC TERMINATION

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

Any action brought against **us** pursuant to coverage under Part III—Uninsured/Underinsured Motorist Coverage must be brought in the county in which the person seeking benefits resides, or in the United States District Court serving that county.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

## OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. That insured person may be

30

required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. However, this shall not apply to amounts paid by **us** under Part II—First Party Benefits Coverage unless the payments are subject to the Workers' Compensation Act. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

**JOINT AND INDIVIDUAL INTERESTS**

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy. Any rejection of coverage available under Part III—Uninsured/Underinsured Motorist Coverage should be made by the first named insured.

**BANKRUPTCY**

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.



9611D PA 0216

# EXHIBIT B

# Vehicle Valuation Report

Prepared For   Progressive Group of Insurance Companies   (800) 321-9843



## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-2069812-01 | | COLLISION | YESHONDA DRIGGINS 206 WATSON RD SHARON HILL, PA 19079 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 10/09/2019 | 10/09/2019 | 10/11/2019 | 1009473114 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2007 | Buick | LaCrosse CXL 4 Door Sedan 3.8L 6 Cyl Gas A FWD | PA 19079 | 135,844 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| | | 2G4WD552271117837 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Dual Source Base Value = | $5,010.83 |
| Condition - | $793.68 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $40.00 |
| Refurbishment | $0.00 |
| Market Value = | $4,257.15 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $200.00 |
| Settlement Value = | $4,057.15 |

## Settlement Value:
## $4,057.15

**J.D. POWER**



Mitchell **WorkCenter**™
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Daytime Running Lamps, switchable | Door handles, chrome |
| Glass, solar-ray light-tinted | Grille, chrome surround with graphite colored accents |
| Headlamps, halogen composite with Twilight Sentinel and flash-to-pass feature | License plate bracket, front (Standard only in states that require a front license plate. Available to order through SPO.) |
| Mirrors, outside power-adjustable, body-color | Moldings, body-color bodyside |
| Wipers, front intermittent, structure-less wiper blades | |

### Interior

| | |
|---|---|
| Air conditioning, dual-zone automatic climate control with individual climate settings for driver and right-front passenger and rear seat heating/cooling outlets | Air filtration system |
| Antenna, integral rear | Assist handles, front passenger and rear outboard with coat hook on left rear passenger assist handle (Front passenger assist handle not available when (CF5) power sunroof is ordered.) |
| Audio system, AM/FM stereo with CD player, seek-and-scan, digital clock, auto-tone control, speed-compensated volume, Theftlock and 6 speakers | Cargo net, trunk |
| Cruise control | Defogger, rear-window electric |
| Door locks, power programmable with lockout protection and enhanced safety | Floor mats, front and rear, stain-resistant |
| Instrumentation, with Driver Information Center and compass, 5-button includes language selection (English, Spanish and French), date, oil life monitor, odometer, driver warning messages, personalization features (door locks and interior/exterior lighting), reminder tones and analog instrumentation (speedometer, temperature, fuel, tachometer and trip odometer) | Lighting, interior with glovebox, trunk, delayed entry/exit with theater dimming, rear courtesy, front footwell and front map lights |
| Mirror, inside rearview manual day/night | OnStar, 1-year of Directions and Connections plan. Includes the innovative easy to use Turn-by-Turn Navigation services which provide voice-guided directions (where available). Also includes Automatic Notification of Air Bag Deployment, Stolen Vehicle Location Assistance, Emergency Services, Roadside Assistance, Remote Door Unlock, OnStar Vehicle Diagnostics, Hands-Free Calling, AccidentAssist, Remote Horn and Lights, Information and Convenience Services, and Driving Directions. (OnStar services require vehicle electrical system (including battery), wireless service and GPS satellite signals to be available and operating for features to function properly. OnStar acts as a link to existing emergency service providers. Stolen Vehicle Location Assistance and Remote Door Unlock success varies with conditions. OnStar Vehicle Diagnostics available on most 2004 MY and newer GM vehicle |
| Personalization features, includes driver memory, 2 specific Remote Keyless Entry FOB controls for the driver identification greeting, audio system settings, station presets, content theft, automatic door locks, activation verification, perimeter lighting, delayed locking and (UD7) Rear Parking Assist (if equipped) ((UD7) Rear Parking Assist included and only available with (PCI) Driver Confidence Package.) | QuietTuning |
| Remote keyless entry | Retained accessory power, power windows, audio system and sunroof remain operational after ignition is switched off for 10 minutes or until a door is opened |
| Seat adjuster, driver 2-way power lumbar | Seat adjuster, driver 6-way power |
| Seat trim, leather-appointed seating | Seat, rear split-folding with armrest and dual cup holders |
| Seats, front bucket, includes 6-way power driver seat adjuster, 2-way manual front passenger seat adjuster with fore/aft controls, outboard head restraints, front seatback map pockets and rear armrest with dual cup holders | Steering column, Tilt-Wheel, adjustable |
| Steering wheel, leather-wrapped with mounted cruise controls | Theft-deterrent system, content theft alarm, immobilizer |
| Theft-deterrent system, vehicle, PASS-Key III | Tire pressure monitoring system |
| Trunk release, driver and front passenger door lock buttons, push and hold 3 seconds | Visors, driver and front passenger illuminated vanity mirrors, sliding |
| Windows, power with driver express-down | |



## Mechanical

| | |
|---|---|
| Axle, 3.05 ratio | Battery, 600 cold-cranking amps, maintenance-free with rundown protection |
| Brakes, 4-wheel antilock, 4-wheel disc | Exhaust, stainless-steel |
| Front wheel drive | Steering, power, rack-and-pinion |
| Suspension, 4-wheel independent, Premium Ride | Tire, compact spare, includes steel wheel |
| Tires, P225/60R16 all-season, blackwall, steel-belted radial | Traction control, Enhanced Traction System (ETS), powertrain-modulated |
| Wheels, 16" (40.6 cm) 8-spoke painted aluminum | |

## Safety

Air bags, dual-stage frontal, driver and right-front passenger and head curtain side-impact, front and rear outboard seating positions with Passenger Sensing System (Head Curtain side air bags are designed to help reduce the risk of head and neck injuries to front and rear seat occupants on the near side of certain side-impact collisions.  Always use safety belts and the correct child restraints for your child's age and size.  Even in vehicles equipped with air bags and the Passenger Sensing System, children are safer when properly secured in a rear seat.  Never place a rear- facing infant restraint in the front seat of any vehicle equipped with an active frontal air bag.  See the vehicle's Owner's Manual and child safety seat instructions for more safety information.)

Door locks, child security, rear

Horn, dual-note high and low

LATCH system, (Lower Anchors and Top tethers for CHildren), for child safety seats in all rear seating positions

Safety belts, 3-point, driver and right-front passenger (Includes center position lap belt when (AV8) 6-passenger seating is ordered.)

Safety belts, 3-point, rear, all seating positions

## Optional Equipment

STEERING COLUMN, TILT AND TELESCOPIC

**\*DIO/PIO =**   Dealer/Port Installed Options

## N.A.D.A Vehicle Equipment  [ 2007 BUICK Lacrosse Sedan 4D CXL WD5  ]

ALUMINUM/ALLOY WHEELS

# Loss Vehicle Dual Source Base Value

Loss vehicle:  2007 Buick LaCrosse CXL 4 Door Sedan 3.8L 6 Cyl Gas A FWD

Guide Valuation: N.A.D.A. Eastern  -  Retail Value

WORKCENTER™  TOTAL LOSS

| | | | | |
|---|---|---|---|---|
| Base Value: | **$4,800.00** | | Base Value: | **$5,046.66** |
| Mileage Adjustment: | $175.00 | | | |
| Aluminum/Alloy Wheels: | Inclusive | | | |
| **Total Retail Value:** | **$4,975.00** | | | |

Dual Source Average Base Value:                                                              $5,010.83

# Loss Vehicle Base Value

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **133,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---------------------|---------|----------|----------------------------|-------|----------------|
| 1 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 74,603 | 19064 | 5 miles | $7,797.00 List Price | $5,227.15 |
| 2 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 87,782 | 08030 | 8 miles | $8,488.00 List Price | $6,174.93 |
| 3 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 79,379 | 19720 | 25 miles | $8,495.00 List Price | $4,923.93 |
| 4 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 38,996 | 19047 | 28 miles | $8,487.00 List Price | $5,487.54 |
| 5 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 62,008 | 19711 | 28 miles | $6,995.00 List Price | $4,022.53 |
| 6 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 64,421 | 19555 | 54 miles | $7,295.00 List Price | $4,543.90 |
| 7 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 99,945 | 07060 | 67 miles | $6,999.00 List Price | $4,946.67 |

**Base Value:** **$5,046.66**

# Loss Vehicle Adjustments

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

## Condition Adjustments

Condition Adjustment:  -$793.68          Overall Condition:  2.46-Fair          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| SEATS | 2 Fair | EXTENSIVE CREASING |
| DASH/CONSOLE | 3 Good | |
| DOORS/INTERIOR PANELS | 3 Good | |
| HEADLINER | 3 Good | |
| GLASS | 3 Good | |
| CARPET | 2 Fair | MORE THAN 3 PERMANENT STAINS |
| **Exterior** | | |
| VINYL/CONVERTIBLE TOP | Typical | |
| BODY | 2 Fair | MULTIPLE LARGE DENTS RIGHT 1/4 AND RR DOOR |
| PAINT | 3 Good | |
| TRIM | 2 Fair | RR WHEEL IS MISSING |
| **Mechanical** | | |
| TRANSMISSION | 2 Fair | OIL BUILDUP |
| ENGINE | 3 Good | |
| Tire | 2 Fair | 2/32 RF, 6/32 RR, 4/32 LR, 7/32 LF NEW TIRE 10/32 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | CD PLAYER / MEDIA PLAYER | INSTANT QUOTE | | | $40.00 |

## Comparable Vehicles

Loss vehicle:  2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

| 1 | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | | | **List Price:  $7,797.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582071192032 | G196309A | 10/05/2019 | 19064 | 5 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

PIAZZA HONDA OF SPRINGFIELD

780 BALTIMORE PIKE

SPRINGFIELD PA 19064

800-719-8045

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$896.00 |
| Mileage | 135,844 | 74,603 | -$1,354.36 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$347.27 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $27.78 |
| | | Total Adjustments: | -$2,569.85 |
| | | **Adjusted Price:** | **$5,227.15** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

---

| **2** | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | | | List Price:  **$8,488.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582X71203604 | 203604B | 09/18/2019 | 08030 | 8 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

GORMLEYS AUTO CENTER

101 CRESCENT BLVD

GLOUCESTER CITY NJ 08030

877-904-7629

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$976.00 |
| Mileage | 135,844 | 87,782 | -$1,220.64 |
| Equipment | | | |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$89.21 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | No | $30.24 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$57.46 |
| | | Total Adjustments: | -$2,313.07 |
| | | **Adjusted Price:** | **$6,174.93** |

Comparable Vehicle Package Details:

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM

---

| **3** | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | | | List Price:  **$8,495.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582X71127706 | P0814 | 07/31/2019 | 19720 | 25 miles |



**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

NEW CASTLE MOTORS

234 SOUTH DUPONT HIGHWAY

NEW CASTLE DE 19720

800-940-1257

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$977.00 |
| Mileage | 135,844 | 79,379 | -$1,383.46 |
| Equipment | | | |
| REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE | No | Yes | -$43.88 |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$378.32 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $30.27 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$89.28 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$57.51 |
| SUNROOF, POWER, TILT-SLIDING | No | Yes | -$272.39 |
| REGULAR PRODUCTION ACCESSORY, SPOILER, REAR | No | Yes | -$83.23 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$89.28 |
| WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM | No | Yes | -$226.99 |
| | | **Total Adjustments:** | -$3,571.07 |
| | | **Adjusted Price:** | **$4,923.93** |

Comparable Vehicle Package Details:

REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM, SUNROOF, POWER, TILT-SLIDING, REGULAR PRODUCTION ACCESSORY, SPOILER, REAR, SEATS, HEATED DRIVER AND FRONT PASSENGER, WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM

| 4 | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | | | **List Price:  $8,487.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582971218692 | 119217A | 09/26/2019 | 19047 | 28 miles |

Claim # 19-2069812-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 7

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

TEAM TOYOTA OF LANGHORNE

746 E LINCOLN HWY

LANGHORNE PA 19047

215-741-4200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$976.00 |
| Mileage | 135,844 | 38,996 | -$1,947.87 |
| Equipment | | | |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | No | $30.24 |
| SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER | No | Yes | -$105.83 |
| | | Total Adjustments: | -$2,999.46 |
| | | **Adjusted Price:** | **$5,487.54** |

Comparable Vehicle Option Details:

SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER

---

| 5 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD | List Price: $6,995.00 |
|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582071249863 | N19901A | 09/05/2019 | 19711 | 28 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

PORTER NISSAN

303 E CLEVELAND AVE

NEWARK DE 19711

302-368-6300

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$804.00 |
| Mileage | 135,844 | 62,008 | -$1,414.80 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$311.54 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $24.92 |
| REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE | No | Yes | -$36.14 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$73.52 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$73.52 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$47.35 |
| WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM | No | Yes | -$186.92 |
| XM SATELLITE RADIO. | No | Yes | -$49.60 |
| | | Total Adjustments: | -$2,972.47 |
| | | **Adjusted Price:** | **$4,022.53** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

SEATS, HEATED DRIVER AND FRONT PASSENGER, REMOTE VEHICLE STARTER SYSTEM, WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM, XM SATELLITE RADIO.

---

| 6 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD | | List Price:  $7,295.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582971200094 | 200094 | 08/05/2019 | 19555 | 54 miles |

Source

DEALER WEB LISTING - BUILDSHEET - VAST.COM

PERRY AUTO SERVICES &AMP; SALES

12 BELLEVUE AVE

SHOEMAKERSVILLE PA 19555

610-562-7192

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$839.00 |
| Mileage | 135,844 | 64,421 | -$1,435.44 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$324.88 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $25.99 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$76.67 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$49.38 |
| XM SATELLITE RADIO. | No | Yes | -$51.72 |
| | | Total Adjustments: | -$2,751.10 |
| | | **Adjusted Price:** | **$4,543.90** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM, XM SATELLITE RADIO.

---

| 7 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD | | List Price:  $6,999.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582171244431 | 244431-SOM118 | 09/30/2019 | 07060 | 67 miles |

Mitchell WorkCenter
Total Loss

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

M & R AUTO SALES

505 SOMERSET STREET

NORTH PLAINFIELD NJ 07060

908-755-1400

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$805.00 |
| Mileage | 135,844 | 99,945 | -$813.46 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$311.69 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $24.94 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$73.56 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$73.56 |

|  | Total Adjustments: | -$2,052.33 |
|---|---|---|
|  | **Adjusted Price:** | **$4,946.67** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

SEATS, HEATED DRIVER AND FRONT PASSENGER

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2007 Buick LaCrosse CXL | 4 Door Sedan 3.8L 6 Cyl Gas  FWD | $24,840.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

Any person who knowingly and with intent to defraud any insurer, self-insured, insurance licensee, person or the public files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.  Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.